IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK D. BAYLIS, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:12-CV-02144 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Brann) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**Introduction**

Plaintiff Mark D. Baylis has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Baylis' claims for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Baylis met the insured status requirements of the Social Security Act through December 31, 2012. Tr. 18.[1]

Baylis protectively filed his application for social security disability insurance benefits on February 10, 2010, claiming that he became disabled on

---

[1] References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

December 18, 2006.  Tr. 116, 117.  Baylis has been diagnosed with several impairments, including: degenerative disc disease of the lumbar spine, Raynaud's disease,[2] cervicalgia, idiopathic neuropathy, residuals of cold injuries, gastroesophaegal reflex disease, carpal tunnel syndrome, os trigonum in the right ankle, right shoulder and bilateral ankle degenerative joint disease, cervical and lumbar spinal stenosis, bulging discs in the thoracic and cervical spine, lumbar spondylolysis, fibromyalgia, and osteoarthritis of the knees.  Tr. 18, 282, 336, 582, 873-74, 1034, 1151, 1160, 1163, 1367.  On May 19, 2010, Baylis' application was initially denied by the Bureau of Disability Determination.  Tr. 108.

On July 12, 2010, Baylis requested a hearing before an administrative law judge ("ALJ").  Tr. 113.  The ALJ conducted a hearing on September 9, 2010, where Baylis was represented by an attorney.  Tr. 31-56.   On May 4, 2011, the ALJ issued a partially favorable decision, awarding benefits as of December 13, 2010, but denying benefits prior thereto.  Tr. 16-25.  On August 23, 2012, the Appeals Council declined to grant review.  Tr. 1.

---

[2] Raynaud's disease "is a condition that causes some areas of your body — such as your fingers, toes, the tip of your nose and your ears — to feel numb and cool in response to cold temperatures or stress. In Raynaud's disease, smaller arteries that supply blood to your skin narrow, limiting blood circulation to affected areas." MayoClinic.com, Raynaud's disease definition, *available at* http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/CON-20022916 (last visited July 25, 2014).

Baylis subsequently filed a complaint before this Court on October 26, 2012. Supporting and opposing briefs were submitted and this case became ripe for disposition on May 24, 2013, when Baylis declined to file a reply brief.

Baylis appeals the ALJ's determination on two grounds: (1) the ALJ erred at step three of the sequential evaluation process by finding that Baylis did not meet or equal a listing, and (2) the ALJ failed to account for Baylis' limitations in concentration, persistence, and pace. For the reasons set forth below, this case is remanded to the Commission for further proceedings.

**Statement of Relevant Facts**

Baylis is 53 years of age, has bachelor's degree, and is able to read, write, speak, and understand the English language. Tr. 33, 135, 1059. Baylis had twenty-six years of past relevant military work, which is classified as heavy, skilled work. Tr. 51.

    A.    **Baylis' Physical Impairments**

On June 10, 2005, an MRI of Baylis' lumbar spine revealed serious impairments, including spondylolisthesis and a disc bulge at the L5 level that compromised the exiting nerve roots. Tr. 171. After conservative treatment measures failed, on June 19, 2006, Baylis underwent 360 degree L5-S1 fusion surgery, including the installation of pedicle screws and rods. Tr. 1196-97. At a follow-up appointment on August 18, 2006, Baylis was "doing well;" his right-

sided radicular symptoms had resolved and his back pain was "actually very minimal." Tr. 1312. Baylis had no weakness, had a normal gait, and was ambulating well. Tr. 1311-12.

On August 28, 2006, Baylis presented to Mary Gabriel, M.D. for a comprehensive evaluation. Tr. 192-97. Dr. Gabriel noted that Baylis' fusion surgery had been fairly successful in treating his lower back symptoms, but Baylis was still experiencing neck pain. Tr. 192-93. Dr. Gabriel noted that previous MRI scans had revealed four protruding discs in Baylis' cervical spine. Tr. 193. Baylis had been offered surgical treatment for his cervical issues, but declined because his neurosurgeon only "gave him a 50/50 chance of being better or worse after the surgery." Id. Baylis had slightly reduced strength in his deltoids and tenderness to palpation in his lumber spinal region. Tr. 195. Baylis had a negative straight left test, and had an otherwise normal physical examination. Id.

During 2006, Baylis had a series of x-rays conducted; these tests revealed osteoarthritis in his ankles and fingers, as well as marked deformities in his fourth and fifth metacarpals. Tr. 1234, 1239, 1240-44. By January 17, 2007, Baylis reported that his lumbar pain had returned, accompanied by cervical spinal pain and severe muscle spasms. Id. His active problems included, inter alia,

cervicalgia,[3] herniated discs in the lumbar spine, lumbosacral spondylolysis,[4] thoracic disc degeneration, and cervical disc degeneration.  Tr. 1226.  At a May 22, 2007 appointment, Baylis' sensation was decreased bilaterally in his lower extremities.  Tr. 1281.

On June 20, 2007, Baylis returned to the hospital complaining of continuing back pain, as well as shoulder pain.  Tr. 1273.  Baylis had a limited range of motion in his shoulder due to pain.  Tr. 1277.  Additionally, his cervical spine flexion and extension were limited to twenty degrees due to pain, and his right and left rotation range of motion was limited to forty degrees due to pain.  Id.  On September 26, 2007, Dominic Castrignano, D.O. examined Baylis' hands.  Tr. 1105.  Dr. Castrignano opined that hand and finger impairments moderately hampered Baylis' ability to perform activities of daily living.  Tr. 1107.

On October 14, 2007, Baylis returned to Dr. Castrignano for an appointment relating to residuals from previous cold injuries.  Tr. 299.  Baylis had suffered from

---

[3] "Cervicalgia is neck pain that occurs toward the rear or the side of the cervical vertebrae ... The term cervicalgia covers a broad range of neck pain causes, including whiplash ... It also could be caused by a number of abnormalities in the region of the cervical vertebra, including a bulging disc, a pinched nerve, narrowing of the spinal canal (stenosis), spinal arthritis or degenerative disc disease." Michael Perry, M.D., Laser Spine Institute, Cervicalgia, *available at* http: // www.laserspineinstitute.com /back—problems/neck_ pain/overview/cervicalgia/ (last visited July 25, 2014).

[4] "Spondylolysis is a specific defect in the connection between vertebrae, the bones that make up the spinal column. This defect can lead to small stress fractures (breaks) in the vertebrae . . . When symptoms do occur, low back pain is the most common. The pain usually spreads across the lower back, and might feel like a muscle strain. The pain is generally worse with vigorous exercise or activity." ClevelandClinic.org, Spondylolysis, *available at* http://my.clevelandclinic.org/disorders/Back_Pain/hic_Spondylolysis.aspx (last visited July 25, 2014).

frost bite and other cold injuries during his time in the military; these injuries led to burning, stinging, and numbness in his ears, hand, and feet. Tr. 299-300. Dr. Castrignano opined that these injuries led to moderate impairments when working in cold or damp conditions, and moderate limitations in Baylis' ability to care for himself. Tr. 303, 345. The cold injuries also severely impacted Baylis' ability to perform chores and exercise. Tr. 346. Dr. Castrignano diagnosed Baylis with residual of cold injuries to the hands, ears, and feet with paresthesias and cold sensitization. Tr. 310.[5]

On October 15, 2007, Baylis presented to John Shonk, Jr., the medical director of geriatrics and rehabilitation at the Wilkes-Barre Veteran's Medical Center. Tr. 1056-64. Dr. Shonk, Jr. noted that Baylis had "multiple degenerative disks in the neck and back [and has] been diagnosed elsewhere as having carpal tunnel syndrome which was responsible for numbness and tingling problems . . ." Tr. 1057. Baylis reported mild clumsiness, which Dr. Shonk, Jr. attributed to his carpal tunnel syndrome and related difficulties feeling or holding objects. Tr. 1059. Baylis stated that he wished to continue working, and was undergoing vocational rehabilitation in an attempt to find a new career. Id. However, Dr. Shonk, Jr. emphasized that Baylis could not perform any jobs that required more than sedentary to light duty, and could not hold a position for a long period of time,

---

[5] At this appointment, Baylis had a normal gait, and his reflexes were normal throughout. Tr. 318, 320-21.

or "do lots of bending, twisting, and reaching[.]" Id.  At this appointment, Baylis had 5/5 strength throughout, but also had "dysfunctional guarding" and multiple tender points throughout his back.  Tr. 1061.  His deep tendon reflexes were 2/4, and his ankle jerk reflexes were only 1/4.  Tr. 1061.  Baylis also had decreased vibration sensation in his lower right extremity.  Id.

On October 30, 2007, Baylis was examined for traumatic brain injury.  Tr. 1033-35.  Baylis complained of difficulty with short-term memory and an inability to concentrate and focus.  Tr. 1034.  His deep tendon reflexes were 2/4 in his biceps and 1/4 in his ankles.  Id.  Baylis had slightly decreased vibratory sensation on his right side and a limited range of motion in his left shoulder.  Tr. 1034-35.  Baylis was diagnosed with possible mild traumatic brain injury accompanied by cognitive impairments, and fibromyalgia.[6]  Tr. 1034.

On April 11, 2008, Baylis presented to John Feerick, M.D. for a neurological examination.  Tr. 1004.  Imaging studies revealed degenerative foraminal stenosis in Baylis' cervical spine and thoracic disc protrusions at the T5-6 and T6-7 level.  Id.  Dr. Feerick noted chronic pain in the cervical, thoracic, and lumbar spine, as well as a "bewildering number of joint pains."  Tr. 1005.  Dr. Feerick believed that

---

[6] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals." MayoClinic.com, Fibromyalgia definition, *available at* http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/CON-20019243 (last visited July 25, 2014).

Baylis' prognosis for recovery from his spinal issues was guarded at best.  Tr. 1006.

On May 21, 2008, EMG and nerve conduction tests were performed; these tests revealed generalized motor and sensory polyneuropathy with features of demyelination and axonal loss.[7]  Tr. 339, 343.  On March 2, 2009, Baylis complained of spinal pain; he stated that, although the fusion surgery on his lumbar spine had resolved his radicular pain symptoms, he still experienced back pain and radicular numbness.  Tr. 841-43.  Baylis had 5/5 strength throughout, symmetric reflexes, and normal mobility in his spine.  Tr. 847.  However, Baylis again had decreased sensation to vibration bilaterally in his lower extremities.  Id.

On May 4, 2009, a neuro-psych test revealed no cognitive deficits.  Tr. 773-77.  The results of this test were "consistent with marked improvement since [his] original testing."  Tr. 777.  Baylis continued to worry about memory problems, and therefore presented to Judith Hogg, M.D. on May 13, 2009 for a follow-up.  Tr. 746.  Dr. Hogg opined that Baylis' head injuries likely were not producing ongoing changes.  Tr. 747.  Dr. Hogg believed that Baylis "had a series of closed head injuries with a least two producing unconsciousness.  He may not expect much

---

[7] A June 25, 2009 EMG and nerve conduction study did not reproduce these results.  Tr. 697-700.  While the study was abnormal, polyneuropathy was not confirmed, and the technician opined that the abnormalities revealed in the May 2008 study were more likely explained by injuries to the median and ulnar nerves.  Tr. 699.

improvement in his cognitive symptoms at this time . . . but he may also not expect deterioration due to [traumatic brain injury] at this point in time." Id.

On June 1, 2009, Dr. Feerick stated that the neurology department could do nothing further to treat Baylis' medical issues; Dr. Feerick suggested that Baylis seek a tertiary evaluation for treatment of his issues. Tr. 715-16. An MRI of Baylis' lumbar spine was conducted on June 9, 2009. Tr. 1162. The MRI revealed degenerative disc changes at the L4-5 level with a minimal diffuse posterior disc bulge. Tr. 1163. Furthermore, Baylis was suffering from mild to moderate bilateral foraminal stenosis caused by bilateral facet joint hypertrophy. Tr. 1163. These issues were described as major abnormalities. Id.

On July 21, 2009, Baylis presented to Indubhai Patel, M.D. Tr. 649. Dr. Patel noted that Baylis had good motor strength, but also experienced numbness in his fingers, toes, face, and buttocks. Tr. 668. On October 30, 2009, Dr. Patel stated that Baylis had a history of lower extremity radiculopathy, resulting in numbness, occasional fecal incontinence, and possible urinary incontinence. Tr. 614. Dr. Patel also noted that Baylis experienced numbness in his hands due to carpal tunnel syndrome. Tr. 619.

On November 9, 2009, Dr. Feerick diagnosed Baylis with idiopathic polyneuropathy. Tr. 604. Baylis had previously been placed on steroids, which were then tapered down to methocarbamol; this treatment significantly improved

9

Baylis' joint pain and peripheral neuropathy. Tr. 603. Dr. Feerick opined that "[n]o primary treatment [was] possible" for Baylis' polyneuropathy. Tr. 604. On November 16, 2009, Baylis presented to Dr. Patel complaining of chronic right shoulder pain. Tr. 578. Imaging studies of Baylis' right shoulder revealed moderate degenerative changes, and Dr. Patel diagnosed Baylis with degenerative joint disease of the right shoulder. Tr. 582.

On December 11, 2009, MRI studies were conducted on Baylis' lumbar and cervical spine. Tr. 1152-60. The MRI of his lumbar spine again demonstrated a mild broad disc bulge at the L4-5 level with degenerative facet changes that did not result in central canal or foraminal narrowing. Tr. 1155. At the L5-S1 level, there was very slight anterolisthesis of L5 on S1,[8] but the evaluation of this region was limited due to field distortion. Id.

The cervical MRI revealed mild uncovertebral degenerative hypertrophy at the C3-4 level, which resulted in slight narrowing of the right neural foramina. Tr. 1159. At the C4-5 level, there was slight narrowing of the left neuroforamina secondary to uncovertebral hypertrophy. Tr. 1160. At the C5-6 level, there was "mild bilateral uncovertebral hypertrophy with [a] superimposed focal disc protrusion into the right paracentral and foraminal location causing moderate

---

[8] "In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it. More, specifically, the upper vertebral body slips forward on the one below." Demace v. Astrue, 3:11-CV-01960, 2013 WL 1775055, at n. 28 (M.D. Pa. Apr. 25, 2013).

foraminal stenosis."[9]  Id.  At the C6-7 level, there was a "mild broad disc bulge with bilateral uncovertebral hypertrophy together causing [a] slight narrowing of the central canal and mild to moderate bilateral foraminal narrowing."  Id.  These injuries were coded as: "MAJOR ABNORMALITY, ATTN. NEEDED."  Id.

On March 25, 2010, x-rays were taken of Baylis' ankles and knees.  Tr. 1148-1162.  X-rays of the ankles revealed posttraumatic changes at the medial malleoli bilaterally, as well as right-sided os trigonum.[10]  Tr. 1150.  The x-rays of Baylis' knees demonstrated bilateral osteoarthritis.  Tr. 1155.  On July 20, 2010, Baylis had a decreased range of motion in his cervical and lumbar spine, as well as bilateral pain when resistance was applied to the extension of his knees.  Tr. 179.

### B.   Residual Functional Capacity Assessments

On May 18, 2010, Leo Petera, M.D. reviewed Baylis' medical files and opined that he was capable of occasionally lifting and carrying twenty pounds, and frequently lifting or carrying ten pounds.  Tr. 234.  Dr. Petera believed that Baylis

---

[9] "At every level of the spine, nerve roots branch off the spinal cord and exit the spinal column through small canals. Each of these canals is called an intervertebral foramen or foraminal canal, and foraminal stenosis is a narrowing of this canal. Radicular pain results from compression, inflammation and/or injury to a spinal nerve root. Foraminal stenosis can elicit radicular pain, or pain that radiates through the peripheral nerve system into an extremity . . . directly along the course of a specific spinal nerve root." Michael Perry, M.D., Laser Spine Institute, Foraminal Stenosis, *available at* http://www.laserspineinstitute.com/back_problems/foraminal_stenosis/ (last visited July 25, 2014).

[10] Os trigonum is "a condition characterized by the growth of an extra bone behind the ankle bone. Os trigonum syndrome is commonly caused by an ankle injury. One of the symptoms is pain while walking." Robinson v. Temple Univ. Health Servs., CIV.A. 11-4667, 2012 WL 1414318, at *1 (E.D. Pa. Apr. 24, 2012).

could never climb ropes or scaffolds, although he could occasionally climb stairs, ladders, and ramps. Tr. 235. Baylis was capable of occasionally balancing, stooping, kneeling, crouching, and crawling. Id. Finally, Dr. Petera believed that Baylis must avoid concentrated exposure to extreme cold, airborne irritants, and hazards such as unprotected heights and fast-moving machinery. Tr. 236.

On March 10, 2011, Sethuraman Muthiah, M.D., a state agency consultant, examined Baylis. Tr. 1359-69. Dr. Muthiah noted a positive straight leg test bilaterally at forty-five degrees. Tr. 1361. Dr. Muthiah observed that Baylis had an impaired range of motion in his hips, shoulders, knees, and wrists. Tr. 1361-63. Baylis' lumbar spine range of motion was severely impaired; his flexion-extension was reduced by nearly three-fourths to twenty-five degrees, and his lateral flexion was reduced to fifteen degrees bilaterally. Tr. 1361. Baylis' cervical spine range of motion was also impaired: his lateral flexion was reduced to twenty-five degrees bilaterally, his forward flexion was reduced to twenty degrees, his extension was reduced to twenty degrees, and his rotation was reduced to twenty-five degrees bilaterally. Id. Baylis also had impaired ankle reflexes and tenderness throughout his body. Tr. 1367. Dr. Muthiah diagnosed Baylis with, inter alia, degenerative joint disease of the shoulder, knees, and elbows, degenerative disc disease of the lumbar spine, probable fibromyalgia, and posttraumatic stress disorder. Tr. 1367.

Dr. Muthiah believed that Baylis was capable of lifting or carrying up to twenty pounds occasionally, and up to ten pounds frequently. Tr. 1359. However, Dr. Muthiah opined that Baylis could only stand and walk for one to two hours in an eight hour workday, and could only sit for two hours during a workday. Id. Furthermore, Baylis could only occasionally bend, kneel, stoop, crouch, balance, or climb. Tr. 1360. He was also restricted from heights, moving machinery, and temperature extremes. Id.

### C. The Administrative Hearing

On October 15, 2010, Baylis' administrative hearing was conducted. Tr. 31-56. Baylis testified that a previous surgery had left him with "five pins and some rope holding [his] right arm and the right shoulder" together. Tr. 37. Additionally, he testified to having herniated discs and bone spurs in his cervical and thoracic spine, as well as degenerative disc disease throughout his spine. Tr. 38. He stated that nerve damage led to occasional numbness and incontinence. Id. Baylis' pain medication also impacted his medical function. Id.

Baylis testified that his fusion surgery in 2006 had initially helped with his pain, but two to three months later "thing went backward real fast" and he began experiencing severe pain and fecal incontinence. Tr. 38-39. Baylis testified that he had constant pain in his back, accompanied by a shooting, burning pain in his legs. Tr. 40. Baylis stated that he was unable to stand or sit for extended periods

due to the pain; he required frequent breaks and had to constantly shift positions. Tr. 40-41. Even when Baylis was sitting, he generally needed to use a recliner to alleviate the pressure on his spine. Tr. 41. Furthermore, arthritis and numbness in his hands limited the use his hands and resulted in Baylis would frequently dropping items and cutting his hands. Tr. 43. His frostbite issues caused his hands and feet to turn red and caused a burning sensation around cold or heat. Tr. 50.

Baylis stated that he hired cleaners to maintain his home; he could no longer perform these chores due to his medical impairments. Tr. 41. He shared custody of his two children and occasionally cared for his two children. Tr. 34-35. Baylis drove approximately six times per week, for a total of fifty to one hundred miles during the week. Tr. 45-46. He was able to maintain his personal hygiene, but could not take out the garbage or remove snow from his driveway. Tr. 46-47.

After Baylis testified, Karen Cain, an impartial vocational expert, was called to give testimony. Tr. 51. The ALJ asked Ms. Cain to assume a hypothetical individual with Baylis' age, education, and work experience who was limited to light work[11] but could only occasionally climb ramps and stairs and occasionally

---

[11] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

balance, stoop, crouch, crawl, or kneel; the individual could never climb ladders, scaffolds, or ropes. Tr. 51-52. Furthermore, the hypothetical individual would need to avoid concentrated exposure to temperature extremes, airborne irritants, or poorly ventilated environments. Tr. 52. This individual should avoid dangerous machinery or equipment, avoid environments with persistent or high-level noise, and was limited to unskilled work. Tr. 52-53.

Under this hypothetical, Ms. Cain testified that the individual would be able to perform three jobs that exist in significant numbers in the national economy: an office helper, an office clerical worker, or a ticket taker. Tr. 53. The ALJ then modified the hypothetical question so that the individual was limited to sedentary work,[12] with all other restrictions remaining intact. Id. Under this scenario, Ms. Cain testified that the individual would be able to work as a video monitor surveillance worker, an order clerk, or a telephone information clerk. Id.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported

---

[12] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

**The ALJ's Findings at Step Three**

Baylis argues that the ALJ erred in finding he did not meet or equal any listing at step three of the sequential evaluation process.  Specifically, Baylis

contends that the ALJ did not consider whether a combination of impairments may have equaled a listing at step three.

To be considered disabled at step three, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations. Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990)) (emphasis in original). The ALJ must "fully develop the record and explain his findings at step three." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 126 (3d Cir. 2000).

The Third Circuit had repeatedly stated that "it is the ALJ's 'responsibility . . . to identify the relevant listed impairment(s)' and 'develop the arguments both for and against granting benefits.'" Torres v. Comm'r of Soc. Sec., 279 F. App'x 149, 152 (3d Cir. 2008) (quoting Burnett, 220 F.3d at 119–20 n. 2). "Although the claimant bears the burden of proving that his impairments equal or meet those listed in Appendix 1, if a claimant's impairment does not match one listed in Appendix 1, the ALJ is required to perform a comparison between the claimant's impairment(s) and those listed in Appendix 1." Id. (citing 20 C.F.R. § 404.1526).

Here, the ALJ failed to adequately explain why a combination of Baylis' impairments did not meet or equal any listing.  The entirety of the ALJ's analysis of Baylis' combined impairments was summed up in the step three heading:

> Since the alleged onset date of disability, December 18, 2006, the claimant had not had an impairment of combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

Tr. 19.  Such a conclusory statement places the ALJ's decision "beyond meaningful judicial review."  Torres, 279 F.App'x at 152.  See also, Burnett, 220 F.3d at 119.

Moreover, the ALJ's evaluation of the record as a whole further reinforces the conclusion that the ALJ did not evaluate Baylis' impairments in combination to determine whether those impairments equaled a listing.  The ALJ did not consider multiple diagnoses, including: carpal tunnel syndrome, os trigonum in the right ankle, right shoulder and bilateral ankle degenerative joint disease, cervical spine stenosis, bulging discs in the thoracic and cervical spine, lumbar spinal stenosis, lumbar spondylolysis, fibromyalgia, and osteoarthritis of the knees.  Tr. 282, 336, 582, 873-74, 1034, 1151, 1160, 1163, 1367.

Without review of these impairments, or even a brief mention of the medical records containing these diagnoses, the ALJ could not have

19

adequately fulfilled his duties to evaluate a combination of Baylis' impairments.[13]  Consequently, on remand the ALJ must consider all of Baylis' medically determinable impairments, and explain why a combination of impairments either does or does not equal a listing.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.


BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: August 5, 2014

---

[13] To the extent that the Commissioner offers post-hoc rationalization of the ALJ's opinion, such as Baylis' activities of daily living being too extensive to justify him meeting a listing, this Court cannot consider such arguments.  See, Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).